UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 94 CR 187-2 |
| v. ) | |
| ) | Judge John Robert Blakey |
| CARMEN TATE ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR RELIEF UNDER THE FIRST STEP ACT**

The UNITED STATES OF AMERICA, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits the following response to defendant Carmen Tate's motion for relief under the First Step Act, 132 Stat. 5194 *et seq*. For the reasons stated below, Tate's motion should be denied.

**I.      BACKGROUND**

**A.      Offense Conduct**

Tate and co-defendant Eddie Richardson were leaders of the Undertaker Vice Lords, also known as the "Undertakers," which was a large-scale street gang that controlled the distribution of illegal drugs on the west side of Chicago between 1984 and 1991. Tate and Richardson obtained wholesale quantities of illegal drugs for processing and resale. During the course of the conspiracy, Tate and Robinson oversaw the distribution of at least 149 kilograms of heroin, at least 25 kilograms of cocaine base (also known as crack cocaine), and an undetermined amount of powder cocaine. *See* PSR at 1–6.[1]

As leaders of the Undertakers, Tate and Richardson controlled all aspects of the gang, including the sale of heroin and cocaine. For example, Tate and Richardson determined the sale

---

[1] Citations to the Presentence Investigation Report are to "PSR" followed by the page number. Citations to the district court record are to "R.," followed by the document number. The transcript of the August 24, 1995 sentencing hearing is cited as "Tr.," followed by the page number.

price for the drugs as well as the locations where the drugs would be distributed. Tate and Richardson also enforced the rules of the gang through a system of punishments referred to as "violations," including beatings with bats, bricks, and bottles. *See* PSR at 1–6.

Tate and Richardson derived substantial profits from the sale of heroin and cocaine on the streets of Chicago. For example, in 1989, the gang's heroin sales were yielding profits of approximately $30,000 per day. Although Tate's specific drug profits are unknown, the Internal Revenue Service determined that Tate's expenditures between 1985 and 1991 were between $328,615 and $340,615. Tate conspired with co-defendant Juanita Thomas to conceal his earnings from the Internal Revenue Service and the Drug Enforcement Agency, including by purchasing real estate, cars, and other property in cash payments of less than $10,000, purchasing assets using nominees, and failing to file income tax returns. *See* PSR at 1–7.

### B. Charges and Conviction

On March 23, 1994, Tate was charged by indictment with one count of conspiracy to possess with intent to distribute quantities of heroin, cocaine, and cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 846 (Count One); one count of engaging in a continuing criminal narcotics enterprise, in violation of 21 U.S.C. § 848 (Count Two); and one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count Three). R. 1. Prior to trial, the government filed a notice of its intention to seek enhanced penalties, pursuant to 21 U.S.C. § 851; as set forth in the government's notice, given his criminal record, Tate was subject to a mandatory sentence of life imprisonment upon conviction. R. 322. The case proceeded to trial on March 29, 1995. R. 452. The trial continued through May 23, 1995, at the conclusion of which a jury convicted Tate on all three counts of the indictment. R. 602, 605.

**C.     Sentencing**

Prior to sentencing, the United States Probation Office filed the PSR. In calculating the applicable range under the then-mandatory Sentencing Guidelines, the probation officer used the November 1, 1994 edition of the Guidelines Manual. PSR at 8. For Count One, the probation officer determined that the base offense level was 38 because Tate was accountable for the distribution of 149 kilograms of heroin, 25 kilograms of cocaine base, and an undetermined amount of powder cocaine. PSR at 8. With enhancements for the use of a dangerous weapon and Tate's leadership role in the conspiracy, the adjusted offense level for Count One was 44. PSR at 8–10. The probation officer determined that the total and adjusted offense level for Count Two was 44. PSR at 10. With respect to Count Three, the probation officer determined that the base offense level was 14 and that, with enhancements, the adjusted offense level was 20. PSR at 10–12. All three counts were grouped together for sentencing purposes. PSR at 12. Accordingly, with a total offense level of 44 and a criminal history category of V, the probation officer concluded that Tate's Guidelines range was life imprisonment. PSR at 12–16, 25.

Tate's sentencing hearing was held on August 24, 1995. R. 723. At sentencing, the district court adopted Guidelines calculations set forth in the PSR. Tr. 29. Concerning the base offense level, the district court explained that "the amounts of both the heroin proven at the trial and the amounts of cocaine base proven at the trial, well exceed the amount required for a base offense level—the minimal amount required for a base offense level in this case of a level 38." Tr. 6. Specifically, the district court found that "149 kilograms of heroin and 25 kilograms of cocaine base were reasonably foreseeable" to Tate, quantities that were "absolutely clear and established at the trial." Tr. 6–7.

The district court sentenced Tate to life imprisonment. Tr. 46. In imposing the sentence, the district court observed that Tate and Richardson abused their "substantial leadership qualities" to profit from an illegal drug operation:

> They used those leadership qualities to prey upon other young men and their need to belong and their desire for money, and they provided a quick means, which continued to harm the area and society. These defendants took substantial money from the sale of drugs, and as happens with the sale of drugs, provided nothing but misery.

Tr. 45. The district court explained that it would have imposed a life sentence even if such a sentence were not mandatory:

> [G]iven the conduct that was displayed here, and the overwhelming magnitude of the crimes that existed over a substantial period of time, although I am, in essence, today a messenger, if I were to have available to me the entire range from probation or time-served up to and including life imprisonment, as to the crimes that these men have been convicted of, life imprisonment is appropriate.

Tr. 46.

### D. Appeals

On November 14, 1997, the Seventh Circuit affirmed Tate's conviction and sentence in *United States v. Richardson, et al.*, 130 F.3d 765 (7th Cir. 1997). On June 1, 1999, the United State Supreme Court vacated Count Two of the indictment as to co-defendant Richardson in *Richardson v. United States*, 526 U.S. 813 (1999). On remand, the government dismissed Count Two not only as to Richardson but also as to Tate. R. 1028. On March 29, 1999, Tate filed a motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. On November 27, 1999, the district court denied Tate's motion. *See United States v. Tate*, No. 99 CV 2157, 1999 WL 1080613 (N.D. Ill. Nov. 27, 1999).

**II.     ARGUMENT**

Tate has now filed a motion for a sentence reduction under Section 404(b) of the First Step Act of 2018, 132 Stat. 5194 *et seq.* As explained below, Tate's motion should be denied on two grounds: (1) Tate is not eligible for the relief he seeks because he was not sentenced for a "covered offense," as defined in the First Step Act; and (2) even assuming Tate is eligible for relief, the court should exercise its discretion to deny his request for a reduction in his sentence.

**A.     Tate was not sentenced for a "covered offense," as that term is defined in the First Step Act.**

Section 404(b) of the First Step Act authorizes a sentence reduction only if the district court previously imposed a sentence for a "covered offense." A "covered offense," in turn, is defined as a "violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 . . . that was committed before August 3, 2010." Thus, a "violation" qualifies as a "covered offense" only if the "statutory penalties for" that violation were "modified by sections 2 or 3 of the Fair Sentencing Act."

Based on the language and purpose of the Act, it is the government's contention that eligibility for possible relief under the First Step Act rests, not on on Tate's statute of conviction, but on the specific "violation" that he "committed." By referring to a "violation" that was "committed" on a particular date, Section 404(a) sensibly grounds the eligibility inquiry in the actual conduct involved in Tate's violation, rather than the statute under which he was convicted. This reading is consistent with the Supreme Court's interpretation of the term "violation" in other contexts. In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 489 (1985), for example, the Supreme Court held in the context of 18 U.S.C. § 1964(c), that the term "violation" "refers only to a failure to adhere to legal requirements," not to a criminal conviction. The Supreme Court explained that when Congress wishes to refer to "prior convictions, rather than prior criminal activity," it uses

the term "conviction," not "violation." *Id.* at 489 n.7. And in *United States v. Hayes*, 555 U.S. 415 (2009), the Supreme Court held that a statute defining a prior conviction of a "misdemeanor crime of domestic violence" referred in part to the defendant's actual conduct, not the statutory elements of the crime, when it described the prior offense as one "committed by a current or former spouse, parent, or guardian." *Id.* at 426 (quoting 18 U.S.C. § 921(a)(33)(A)); *cf. Nijhawan v. Holder*, 557 U.S. 29, 32 (2009) (holding that a statutory term describing a prior "offense" referred not to a generic crime but to the "particular circumstances in which an offender committed" that offense "on a particular occasion").

In Section 404, Congress easily could have, but did not, declare eligible "any defendant *convicted* under a statute for which the penalties were altered by the Fair Sentencing Act of 2010, so long as that defendant has not already been sentenced in accordance with that Act." Instead, Congress focused specifically on the "violation" that was "committed." Congress's use of the word "committed" in this provision points especially strongly to the particular facts of a defendant's case because Congress added a date-based qualifier: "that was committed before August 3, 2010."

Moreover, it makes more sense to refer to a "violation" whose "statutory penalties were modified" rather than make eligibility under the First Step Act turn on conviction under a "Federal criminal statute, the statutory penalties for which were modified" (which makes the term "statutory" redundant). Thus, the inquiry into what counts as a "covered offense" necessarily turns on facts specific to Tate's offense—when it was committed—and not merely the statutory definitions that appear in 21 U.S.C. § 841(b)(1).

Because the language of the statute reflects Congress's intent for courts to assess eligibility based on a case-specific approach, focusing on the actual violation at issue, courts should not blind themselves to the actual quantity of crack involved in defendants' offenses—especially where the

defendant admitted, or the court expressly found, that quantity as a matter of fact. If, as is the case here, a defendant's "violation" involved a quantity of crack cocaine that would have triggered the same penalty before and after enactment of the Fair Sentencing Act, then the defendant's "violation" is not one for which the statutory penalties were modified by the Act, and the court did not impose a sentence for a "covered offense."

      **B.**    **Application of Section 404 of the First Step Act to reduce the sentences of defendants like Tate, whose sentencing exposure would be no different today, would undermine Congressional intent by increasing sentencing disparities.**

Tate's claimed eligibility to relief under the First Step Act not only undermines the statutory text but also conflicts with Congress's manifest intent, as it would lead to profoundly unfair and illogical disparities between defendants charged before and after the Fair Sentencing Act. There is no dispute that Congress, in enacting Section 404 of the First Step Act, was concerned about a particular class of cocaine base defendants, namely, those whose statutory penalties would have been lower but for the fortuity that they were sentenced before August 3, 2010, and therefore could not take advantage of the Fair Sentencing Act. *See Dorsey v. United States*, 567 U.S. 260 (2012).

For instance, if a crime involved 200 grams of crack, and the defendant was sentenced under Section 841(b)(1)(A) (imposing 10-year mandatory minimum) before August 3, 2010, a court should consider whether to grant a reduced sentence, as the Fair Sentencing Act places the 200-gram offense in Section 841(b)(1)(B) (imposing 5-year mandatory minimum). This consideration puts the offender in a position identical to those of defendants sentenced after August 3, 2010. If, however, the original crime involved 280 or more grams of crack, the defendant's violation would have triggered the same Section 841(b)(1)(A) penalties (10-year mandatory minimum) both before and after the Fair Sentencing Act. If such a defendant had been sentenced

after the Fair Sentencing Act, all agree that he could not obtain a discretionary reduction of sentence today. But under the defense approach—where any conviction involving crack is a "covered offense"—had that same defendant been sentenced before the Fair Sentencing Act took effect, he would now be entitled to a discretionary sentence reduction. Nothing in the text or legislative history of the First Step Act suggests that Congress would have countenanced this asymmetry, which is entirely unfair to defendants sentenced after enactment of the Fair Sentencing Act.

Tate's case illustrates this point. As the district court determined, Tate's offense involved "149 kilograms of heroin and 25 kilograms of cocaine base." Tr. 6. Because his offense easily involved more than a kilogram of heroin and more than 280 grams of crack cocaine, Tate is subject to the same maximum penalties under the drug-trafficking statute both before and after enactment of the Fair Sentencing Act. If Tate were to receive a sentence reduction based on the proffered fiction that his offense involved not even 28 grams of crack cocaine—meaning his statutory maximum sentence under Section 841(b)(1)(C) would be 20 years' imprisonment—his statutory sentencing exposure would be lower than that faced by every other defendant charged with and convicted of the same crime since August 3, 2010. The purpose of the First Step Act was to reconcile the disparity between those sentenced before the Act and those sentenced afterwards. It would turn that goal on its head to afford Tate the windfall of greater relief, untethered to any actual facts. If a reduction were granted, it would allow Tate to avoid the mandatory minimum sentence applicable to all defendants convicted of the same crime prior to August 3, 2010.

To make matters worse, under Tate's proposed approach, nearly every defendant charged under Sections 841(b)(1)(A) or (b)(1)(B) before the Fair Sentencing Act would now be eligible for a sentence reduction, creating a massive disparity between defendants sentenced before and after

enactment of the Act. Before the Fair Sentencing Act, there was no reason for any prosecutor to allege in an indictment more than 50 grams for a subsection A offense or more than 5 grams for a subsection B offense. Under the Fair Sentencing Act, however, those specific quantities—50 grams and 5 grams—are treated less severely. Thus, under the defense view, nearly every defendant charged under those statutes would be treated differently than identically situated defendants charged after the Fair Sentencing Act became effective, even if their violations involved crack quantities substantially exceeding the new statutory thresholds. Tate does not, and cannot, offer any justification for the mass disparity he seeks, or any explanation of why Congress would have intended such an odd result.

### C. The First Step Act does not authorize Tate's requested retroactive application of *Apprendi* or *Alleyne*.

Tate asserts that denial of eligibility at this time, resting on the factual determinations made at the original sentencing, would violate the rulings in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013), that any fact increasing either a statutory maximum or mandatory minimum penalty must be charged in an indictment and found by a jury or admitted by the defendant. These cases do not apply here, because the First Step Act authorizes a court only to "reduce" a sentence, not increase it, and further makes clear that such reductions are discretionary, not mandatory. *See* First Step Act § 404(c) ("[n]othing in this section shall be construed to require a court to reduce any sentence pursuant to this section.").

The situation matches that in *Dillon v. United States*, 560 U.S. 817 (2010), in which the Supreme Court considered a motion for sentencing reduction under 18 U.S.C. § 3582(c)(2), which allows a court to reduce a sentence, in its discretion, upon adoption of a sentencing guideline amendment designated by the Sentencing Commission as retroactive. The Commission's policy statement implementing Section 3582(c)(2) decreed that a court could not, except in limited,

9

specified circumstances, reduce a sentence below the range set by the amended guideline provision. Defendants argued that a further reduction should be allowed based on *Booker v. United States*, 543 U.S. 220 (2005), which rendered the guidelines advisory to remedy a violation of *Apprendi*.

The Supreme Court disagreed. It stated that "[b]y its terms, § 3582(c)(2) does not authorize a sentencing or resentencing proceeding." Rather, it allows courts to "reduce" a sentence of imprisonment in limited circumstances identified by the Sentencing Commission. The Court explained:

> Given the limited scope and purpose of § 3582(c)(2), we conclude that proceedings under that section do not implicate the interests identified in *Booker*. Notably, the sentence-modification proceedings authorized by § 3582(c)(2) are not constitutionally compelled. We are aware of no constitutional requirement of retroactivity that entitles defendants sentenced to a term of imprisonment to the benefit of subsequent Guidelines amendments. Rather, § 3582(c)(2) represents a congressional act of lenity intended to give prisoners the benefit of later enacted adjustments to the judgments reflected in the Guidelines.
>
> Viewed that way, proceedings under § 3582(c)(2) do not implicate the Sixth Amendment right to have essential facts found by a jury beyond a reasonable doubt. Taking the original sentence as given, any facts found by a judge at a § 3582(c)(2) proceeding do not serve to increase the prescribed range of punishment; instead, they affect only the judge's exercise of discretion within that range.

560 U.S. at 828.

*Dillon*'s reasoning applies with full force here. The retroactive application of the Fair Sentencing Act is not constitutionally compelled, but rather is an act of Congressional lenity, which would not, as an ordinary rule in the absence of a Congressional declaration, abrogate prior penalties. *See* 1 U.S.C. § 109. The First Step Act solely calls for the court to determine whether

the statutory penalties would have been different based on the "violation" the defendant "committed," and if so, exercise discretion in determining whether to reduce the sentence.

*Dillon* observed, "[i]t is also notable that the provision applies only to a limited class of prisoners—namely, those whose sentence was based on a sentencing range subsequently lowered by the Commission. Section 3582(c)(2)'s text, together with its narrow scope, shows that Congress intended to authorize only a limited adjustment to an otherwise final sentence and not a plenary resentencing proceeding." *Dillon*, 560 U.S. at 825–26. Here, the statute at issue uses precisely the same term as that seen in Section 3582(c)(2), providing authorization to "reduce" a sentence, not reimpose it. Further, as in the Section 3582(c)(2) context, the Act applies only to a narrow set of offenders, i.e., those who committed crack cocaine offenses and were sentenced before August 3, 2010. And the Act expressly states that the court is not required to reduce any sentence.

Finally, the Supreme Court in *Dillon* added:

> This understanding of § 3582(c)(2) as a narrow exception to the rule of finality finds further support outside the statute. Federal Rule of Criminal Procedure 43 requires that a defendant be present at "sentencing," see Rule 43(a)(3), but it excludes from that requirement proceedings that "involv[e] the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)," Rule 43(b)(4). Like § 3582(c)(2), Rule 35 delineates a limited set of circumstances in which a sentence may be corrected or reduced. Specifically, it authorizes a court to "correct a sentence that resulted from arithmetical, technical, or other clear error" within 14 days after sentencing, Rule 35(a), and it authorizes a reduction for substantial assistance on the Government's motion, Rule 35(b). Rule 43 therefore sets the proceedings authorized by § 3582(c)(2) and Rule 35 apart from other sentencing proceedings.

560 U.S. at 827–28. Rule 43 by its term applies to all motions under Section 3582, not just motions under Section 3582(c)(2) based on retroactive guideline amendments. Therefore, Rule 43 applies here, where the sentencing reduction is authorized by Section 3582(c)(1)(B), and thus the Supreme

Court's explanation applies here too. Proceedings under Section 404 of the First Step Act, as in *Dillon*, do not warrant the application of *Apprendi* or *Alleyne*.

Given the holding in *Dillon*, every appellate court to address the issue has held that a court, when determining whether a defendant is eligible for a sentencing reduction under Section 3582(c)(2) based on a retroactive amendment to the narcotics sentencing guideline, which is driven by drug quantity, may make factual findings based on the original record to determine whether the offense involved a quantity that results in the same sentencing range under the amended guideline and therefore renders the defendant ineligible for relief. See, e.g., *United States v. Rios*, 765 F.3d 133, 138 (2d Cir. 2014); *United States v. Peters*, 843 F.3d 572, 578 (4th Cir. 2016); *United States v. Valentine*, 694 F.3d 665, 670 (6th Cir. 2012); *United States v. Hall*, 600 F.3d 872, 876 (7th Cir. 2010); *United States v. Anderson*, 707 F.3d 973, 975 (8th Cir. 2013); *United States v. Mercado-Moreno*, 869 F.3d 942, 953–55 (9th Cir. 2017); *United States v. Battle*, 706 F.3d 1313, 1319 (10th Cir. 2013); *United States v. Hamilton*, 715 F.3d 328, 340 (11th Cir. 2013); *United States v. Wyche*, 741 F.3d 1284, 1293 (D.C. Cir. 2014).

In those cases where a sentencing court's quantity finding is ambiguous or incomplete, a district court may need to identify the quantity attributable to the defendant with more precision to compare it against the revised drug quantity threshold under the relevant Guidelines amendment. The Supreme Court indicated that such fact-finding was permissible in *Dillon*. *See* 560 U.S. at 828–29 ("facts found by a judge at a § 3582(c)(2) proceeding do not serve to increase the prescribed range of punishment"). The fact-finding necessary to compare the drug quantity attributable to Tate to the revised drug quantity thresholds under the Fair Sentencing Act likewise is not restricted by *Apprendi* and *Alleyne*. In this case, the fact-finding was done by the district

court based on the original record and resulted in a determination that Tate was accountable for 149 kilograms of heroin and 25 kilograms of crack cocaine.

It also bears emphasis that any reduction in sentence under the First Step Act must comport with Section 3582(c)(1)(B), which states, "[t]he court may not modify a term of imprisonment once it has been imposed except that . . . the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute . . . ." The First Step Act allows imposition of a reduced sentence as if the Fair Sentencing Act "were in effect at the time the covered offense was committed." It does not "expressly" authorize the retroactive application of *Apprendi* and *Alleyne*, which are inapplicable for this reason as well. Courts are unanimous in holding that *Apprendi* and *Alleyne* do not apply retroactively to undermine an otherwise final judgment, and Congress did not expressly state otherwise in Section 404 of the First Step Act. Nothing in the Act remotely suggests that Congress authorized retroactive application of *Apprendi* and *Alleyne* to offenders like Tate, while denying it to everyone else.

This court therefore can and should determine whether Tate's violation involved quantities that would have triggered the same penalties had the Fair Sentencing Act been in effect. Here, it is evident that the same sentencing range would have applied. As such, Tate is not eligible for relief.

        **D.**    **The court should exercise its discretion to deny Tate's motion based on the Section 3553(a) factors.**

Even if this court disagrees with the government's interpretation of the term "covered offense," the court should nevertheless exercise its discretion, consistent with Section 404(c) of the First Step Act, to deny relief. Given the known drug quantities involved in the offense, Tate would have received the same sentence if the Fair Sentencing Act had been in effect at the time of

the original sentencing and if the government had presented its case subject to the Fair Sentencing Act's requirements. As the district court observed at sentencing:

> [G]iven the conduct that was displayed here, and the overwhelming magnitude of the crimes that existed over a substantial period of time, although I am, in essence, today a messenger, if I were to have available to me the entire range from probation or time-served up to and including life imprisonment, as to the crimes that these men have been convicted of, life imprisonment is appropriate.

Tr. 45.

Tate should not receive a windfall unavailable to defendants prosecuted for the same conduct under the Fair Sentencing Act, who received sentences based on quantity determinations keyed to the thresholds set forth in that Act. A contrary result here would offend "the need to avoid unwarranted sentencing disparities among" similarly situated offenders under 18 U.S.C. § 3553(a)(6), and the need for a sentence to "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense" under Section 3553(a)(2)(A). *See Dorsey*, 567 U.S. at 276–79 (expressing the importance of consistency in sentencing similarly situated offenders when determining the retroactive application of a statutory amendment). Should the court find Tate eligible for relief under the First Step Act, the court should exercise its discretion to deny Tate's request for a reduction in his sentence.

### III. CONCLUSION

The government respectfully requests that court deny Tate's motion because he is not eligible for relief under the First Step Act. Alternatively, if the court determines that the Tate is eligible for relief, that the court should exercise its discretion consistent with Section 404(c) of the First Step Act to deny relief in order to "avoid unwarranted sentencing disparities among" similarly situated offenders under 18 U.S.C. § 3553(a)(6).

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: */s/ Jared C. Jodrey*
JARED C. JODREY
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
312-353-5358